IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| COLORADO SECURITY CONSULTANTS, LLC, a Colorado limited liability company, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>SIGNAL 88 FRANCHISE GROUP, INC., a Nebraska Corporation, et al.,<br><br>Defendants. | 8:16-CV-439<br><br>MEMORANDUM AND ORDER |

The plaintiffs in this case, Colorado Security Consultants, Timothy Siman, and Jared Iungerich (collectively, CSC), are suing the defendants, Signal 88 Franchise Group and two associated LLCs (collectively, Signal 88), for several claims for relief primarily associated with Signal 88's alleged breach of the parties' franchise agreement. *See* filing 32. Signal 88 has claims of its own, alleging that CSC breached the contract and is tortiously interfering with Signal 88's business relationships. *See* filing 11.

The matter is before the Court on Signal 88's motion for a preliminary injunction (filing 12) seeking to enforce the noncompete provision of its franchise agreement with CSC. The Court finds, however, that Signal 88 has failed to establish the propriety of injunctive relief. *See Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also H&R Block Tax Servs. LLC v. Acevedo-Lopez*, 742 F.3d 1074, 1077 (8th Cir. 2014). Accordingly, the Court will deny Signal 88's motion.

BACKGROUND

Signal 88 is in the business of franchising a "unique management and business system for security services[.]" Filing 14-1 at 1. CSC was one of its franchisees, located in Colorado Springs, Colorado. Filing 14-1 at 2; filing 25-1 at 2. The franchise agreement between the parties contained a noncompete provision that barred a franchisee from engaging in the sale of services sold by Signal 88 within 75 miles of the franchisee's exclusive territory for a period of 3 years after termination of the franchise agreement. Filing 14-2 at 25. The noncompete provision also includes a no-defense clause, providing that the noncompete provision would be construed independent of the other

provisions of the franchise agreement, and that "[t]he existence of any claim or cause of action of [CSC] against [Signal 88] will not constitute a defense to the enforcement by [Signal 88] of the covenants not to compete." Filing 14-2 at 25. And the noncompete provision expressly permits a court to reform its scope if necessary to enforce it. Filing 14-2 at 25-26.

The franchise agreement also contained a provision affording CSC a right of first refusal for any new Signal 88 franchises within a 30-mile radius of CSC's territory. Filing 14-2 at 27. The provision required Signal 88 to provide CSC with notice of any new proposed franchise within the 30-mile radius, and gave CSC 72 hours to notify Signal 88 of CSC's intent to exercise its right to purchase the proposed new franchise instead, on the same terms offered to the prospective new franchisee. Filing 14-2 at 27.

In January 2016, Signal 88 advised CSC that a potential new franchisee, Rebecca Resendes, was interested in getting a Signal 88 franchise in Colorado Springs. Filing 25-1 at 3. Over the next few months, the parties and Resendes discussed a number of different business arrangements, including Resendes purchasing CSC's franchise, reconfiguration of CSC's territory, or compensating CSC for the customer relationships it had established in territory that might become Resendes'. Filing 25-1 at 3-4. In June 2016, Resendes advised CSC that she had acquired a franchise, but CSC says that the parties continued to discuss various buy-out and reconfiguration arrangements. Filing 25-1 at 4. At the end of July, however, Resendes ended those discussions, and Signal 88 told CSC to stop servicing customers in Resendes' new territory, which was within the radius of CSC's right of first refusal. Filing 25-1 at 4.

The franchise agreement had first been executed in 2010, effective for a 3-year term. Filing 14-2 at 5, 28. The agreement wasn't formally renewed in 2013, but the parties agreed to extend the term of the agreement, and amended the agreement in 2015 to memorialize that extension. Filing 25-6 at 2; filing 14-6 at 1. The amendment modified the franchise term to continue the franchise agreement on a month-to-month basis, subject to a 30-day notice of termination, although CSC says it was assured by Signal 88 that the parties would formally renew the franchise agreement in 2016. Filing 14-6 at 1; filing 25-1 at 2. That had not happened before the Resendes negotiations took place, so when CSC was told to stay out of Resendes' new territory, the franchise agreement was still being extended month-to-month.

Signal 88 notified CSC on September 30, 2016, that Signal 88 intended to terminate the franchise agreement effective October 31. Filing 25-5. Since then, CSC has been providing security services under the name "Guardhail." Filing 25-6 at 5. According to Signal 88, under the Guardhail name, CSC has "contacted Signal 88's customers, undercut Signal 88 on price, and caused a

number of customers to cancel contracts with Signal 88." Filing 14-1 at 4. CSC does not contradict those allegations, but does contend that it has "not used any of the names or trademarks of Signal 88," nor is it "using any of Signal 88's manuals or other alleged confidential information or materials in the Guardhail business." Filing 25-1 at 6; filing 25-6 at 5. Signal 88 moves the Court to enjoin CSC from providing security services within 75 miles of its former territory under the franchise agreement. Filing 12.

## DISCUSSION

When deciding whether to issue either a temporary restraining order or preliminary injunction, the Court weighs the four *Dataphase* factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). A preliminary injunction is an extraordinary remedy, and the movant bears the burden of establishing its propriety. *Roudachevski*, 648 F.3d at 705; *see H&R Block*, 742 F.3d at 1077.[1]

### THREAT OF IRREPARABLE HARM

To show a threat of irreparable harm, the movant must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Roudachevski*, 648 F.3d at 706. Stated differently, the harm "must be actual and not theoretical." *Brady v. Nat'l Football League*, 640 F.3d 785, 794 (8th Cir. 2011). And harm is not irreparable when a party can be fully compensated for its injuries through an award of damages. *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 319 (8th Cir. 2009).

The Court does not, at this point, have any reason to question that Signal 88 faces a threat of *harm*. But the question is whether that harm is truly irreparable, or whether it could be remedied after the fact with a permanent injunction and damages. And Signal 88's evidence on the harm it faces is not particularly compelling. Kevin Jones, Signal 88's chief development officer, averred generally that

> The noncompete agreements are included in the Franchise Agreement for a number of reasons including, protection of the

---

[1] The Court applies the federal preliminary injunction standard in a diversity case, at least where the parties have not suggested that state law supplies meaningfully different criteria. *Lanier Prof'l Servs., Inc. v. Ricci,* 192 F.3d 1, 3 (1st Cir. 1999).

> [Signal 88 Security] System, to maintain customer goodwill, to avoid franchisees from acquiring confidential information from the Signal 88 System and then using that information to compete with Signal 88 and/or from taking Signal 88 customers.

Filing 14-1 at 3. And, as summarized above, Jones averred that CSC has established Guardhail, which operates within 75 miles of CSC's former Signal 88 territory and "offers services substantially the same as those offered by CSC when they operated as a Signal 88 franchisee within the [Signal 88 Security] System. Guardhail has contacted Signal 88's customers, undercut Signal 88 on price, and caused a number of customers to cancel contracts with Signal 88." Filing 14-1 at 4.

But identifying the *purpose* of the noncompete provision falls far short of explaining how CSC's present conduct is *actually* threatening Signal 88's goodwill. Nor is it clear how that could be occurring, given that CSC is not using Signal 88's marks. Factors such as price erosion, loss of goodwill, damage to reputation, and loss of business opportunities may all be valid grounds for finding irreparable harm. *See Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013). And money damages may not provide complete relief where harm caused by a breach, even though economic in nature, is impossible to measure accurately. *Ocean Spray Cranberries, Inc. v. PepsiCo, Inc.*, 160 F.3d 58, 61 (1st Cir. 1998); *see, e.g.*, *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705 (7th Cir. 2005); *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995). But on the other hand, it has also been held that a loss of customers or customer goodwill is not truly "irreparable," in the sense that it can be addressed through money damages after a trial on the merits. *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013); *see World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 161 (2d Cir. 2012). And accurate measurement is a matter of degree—courts have refused injunctions to enforce contracts involving ongoing business relationships even if it would be difficult to prove the revenues lost from the breach with perfect accuracy. *Ocean Spray*, 160 F.3d at 61. When the alleged harm is the loss of customers and business, that harm is compensable with money damages. *See World Wide Polymers*, 694 F.3d at 161.

The Court is unpersuaded, in this case, that Signal 88's conclusory evidence that CSC is soliciting Signal 88 customers establishes *irreparable* harm. Potential economic loss may constitute irreparable harm where the loss is so great that it threatens the very existence of a business. *Packard Elevator v. Interstate Commerce Comm'n,* 782 F.2d 112, 115 (8th Cir. 1986).

That is not at issue here. And there is no evidence that Signal 88's goodwill is being substantially threatened. So, the Court is not convinced that the damages in this case would be substantially more difficult to calculate than in any other situation involving lost profits.

The thrust of Signal 88's argument in its brief is the alleged "irreparable harm to its existing contractual relationships" and "irreparable harm to its franchise system." Filing 13 at 4. But there is no evidence supporting that argument. While the Court recognizes the significance of noncompete provisions to protecting the integrity of franchise systems, the Court sees nothing here that distinguishes this case from any other case in which the integrity of a contract is at issue—that is, anything to suggest that damages or injunctive relief *post-judgment* would be insufficient to vindicate the parties' respective contractual obligations and protect Signal 88's system of contractual relationships.

It is Signal 88's burden to "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see Minn. Bearing Co. v. White Motor Corp.*, 470 F.2d 1323, 1326 (8th Cir. 1973). Signal 88 has not met that burden, and a preliminary injunction cannot issue without a showing of irreparable harm. *Dataphase*, 640 F.2d at 114 n.9.

### BALANCE OF HARMS

Obviously, having found little evidence to establish irreparable harm to Signal 88, the Court's finding regarding the balance of harms also weighs in favor of CSC. The Court sees little evidence that Signal 88 is being irreparably harmed, but as CSC points out, the injunction sought by Signal 88 would be devastating to CSC. Because a preliminary injunction is an extraordinary remedy never awarded as of right, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter*, 555 U.S. at 24. Granting an injunction would effectively close CSC's business, and have the effect of mooting several of the parties' claims before they have been addressed on the merits. Accordingly, the balance of harms tips toward CSC.

### LIKELIHOOD OF SUCCESS ON THE MERITS

For the sake of completeness, the Court will also consider the parties' arguments with respect to Signal 88's likelihood of success on the merits. Signal 88 fares somewhat better on this issue, because it does not appear to be meaningfully disputed at this point that CSC is actually engaged in conduct that would contravene the noncompete provision. But that is not to

say that Signal 88's ultimate likelihood of success is entirely clear, or that Signal 88 has met its burden of showing such a likelihood.

To begin with, CSC questions the enforceability of the noncompete provision, arguing that it is unreasonable in scope. The parties disagree about what state's law controls on that issue; Signal 88 cites Nebraska law, while CSC relies on Colorado law. *See*, filing 13 at 6-7; filing 24 at 16-17. On that point, CSC might have the better of the argument: although the franchise agreement provides that Nebraska law governs, filing 14-2 at 26, the Court finds it hard to distinguish the Eighth Circuit's decision in *DCS Sanitation Mgmt., Inc. v. Castillo*, 435 F.3d 892, 895-97 (8th Cir. 2006).

In that case, the Eighth Circuit applied Nebraska conflict-of-law rules (which are also applicable here) to a contract containing a noncompete provision and found that because the agreement was to be performed entirely in Nebraska, and the only relationship with the contractually chosen state of Ohio was that the plaintiff's corporate headquarters was located there, then Nebraska had a greater material interest in the contract. *Id.* The Eighth Circuit further found that because there was a difference between Nebraska and Ohio law regarding whether the noncompete provision could be reformed, applying Ohio law would be contrary to a fundamental public policy of Nebraska. *Id.* So, the Court of Appeals held that Nebraska law controlled. *Id.*

Although Nebraska is the contractually chosen state here, *Castillo* is factually on point: Nebraska conflict of law rules suggest that Colorado has a greater material interest in the franchise agreement. *See id.* And, as in *Castillo*, there is a fundamental difference in the law of Nebraska and Colorado. Under Nebraska law, if a court determines that a noncompete agreement is unreasonable, the court will not reform the noncompete agreement in order to make it enforceable.[2] *Id.* at 897. Colorado law, on the other hand, permits such reformation. *See*, *Energex Enters., Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1283 (D. Colo. 2003); *Nat'l Graphics Co. v. Dilley*, 681 P.2d 546, 547 (Colo. App. 1984). Pursuant to *Castillo*, the Court's conclusion at this point in the case is that Colorado law is applicable when determining the enforceability of the noncompete provision.

Under Colorado law, noncompete provisions are disfavored, and are unenforceable except under a few narrowly construed statutory exceptions.

---

[2] Signal 88 argues to the contrary, relying on the Nebraska Franchise Practices Act, Neb. Rev. Stat. § 87-401 *et seq*., which does permit a noncompete agreement to be reformed. *See* Neb. Rev. Stat. § 87-404(2). (CSC, for its part, relies on the Franchise Practices Act for one of its claims for relief. *See* filing 32 at 28-29.) But the Franchise Practices Act applies only to a franchise "the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of Nebraska," which does not appear to be the case here. *See* Neb. Rev. Stat. § 87-403.

- 6 -

Colo. Rev. Stat. § 8-2-113; *see Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910 (Colo. App. 1997). The franchise agreement could fall within one of the statutory exceptions, for "purchase and sale of a business" or "protection of trade secrets." *See*, *Keller Corp. v. Kelley*, 187 P.3d 1133, 1139 (Colo. App. 2008); *Gold Messenger*, 937 P.2d at 910; *see also*, *Big O Tires, LLC v. JDV, LLC*, No. 08-CV-1046, 2008 WL 4787619, at \*3-4 (D. Colo. Oct. 31, 2008); *Quizno's Corp. v. Kampendahl*, No. 01-CV-6433, 2002 WL 1012997, at \*4-6 (N.D. Ill. May 20, 2002) (applying Colorado law); *I Can't Believe It's Yogurt v. Gunn*, No. Civ. A. 94-2109, 1997 WL 599391, at \*21 (D. Colo. Apr. 15, 1997). But even a noncompete provision that falls within a statutory exception must be reasonable as to its territorial reach and duration. *Keller Corp.*, 187 P.3d at 1138. And whether the noncompete provision's scope is reasonable is determined with reference to the purpose of the covenant—that is, with reference to the statutory exception into which the provision falls. *See Gold Messenger*, 937 P.2d at 910; *see also Keller Corp.*, 187 P.3d at 1139-40.

The problem the Court has here, in attempting to assess Signal 88's likelihood of success on the merits, is that there is no evidence before the Court that would allow it to determine whether the scope of the noncompete provision is reasonable. Whether a particular duration or geographic scope is "reasonable" depends on the facts of each case. *Energex Enters.*, 250 F. Supp. 2d at 1283. The Court must examine the circumstances of the contracting parties to determine whether a noncompete provision is justified at all, and then examine the specific terms of the provision to determine the reasonableness of its effect. *Id.* But this is a fact-driven test, *see id.*, and the Court has very little to work with.

For instance, if justified as necessary to protect trade secrets, the reasonable scope of a noncompete provision may depend on the substance of the trade secrets, and the extent to which they are being employed. *See Gold Messenger*, 937 P.2d at 911-12; *see also Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d 763, 765-66 (Colo. App. 1988). Signal 88's evidence describes its confidential information only in very general terms. *See* filing 14-1 at 1-2. Other factors that may be relevant to the reasonable scope of the noncompete provision might be the nature of the business, the size of the relevant market, and the area in which the businesses operate. *See*, *Zeff, Farrington & Assocs., Inc. v. Farrington*, 449 P.2d 813, 814 (Colo. 1969); *Colonial Life & Acc. Ins. Co. v. Kappers*, 488 P.2d 96, 97 (Colo. App. 1971); *see also Reed Mill & Lumber Co. v. Jensen*, 165 P.3d 733, 737-38 (Colo. App. 2006). But again, there is very little in the record that permits the Court to evaluate whether the scope of the noncompete provision is "no wider . . . than necessary to afford the required protection." *Miller v. Kendall*, 541 P.2d 126, 127 (Colo. App. 1975); *cf. Energex Enters.*, 250 F. Supp. 2d at 1283.

CSC also argues that although the franchise agreement deems the relationship between the parties to be that of independent contractors, *see* filing 14-2 at 23-24, the actual relationship was that of employer and employee, *see* filing 24 at 18. And under Nebraska or Colorado law, that would make a substantial difference in determining whether the noncompete provision is reasonable. *See*, *Unlimited Opportunity, Inc. v. Waadah*, 861 N.W.2d 437, 637-38 (Neb. 2015); *Reed Mill*, 165 P.3d at 736-37. It is also, under Nebraska or Colorado law, a fact-intensive inquiry. *See*, *e.g.*, *Omaha World-Herald v. Dernier*, 570 N.W.2d 508, 513-18 (Neb. 1997); *Stampados v. Colorado D & S Enterprises, Inc.*, 833 P.2d 815, 816-17 (Colo. App. 1992). And again, it is a fact-intensive inquiry that the record provides little basis for the Court to undertake. In fact, Signal 88 did not even address this argument in its briefs. *See*, filing 13; filing 28.[3]

In sum, while the basic facts of the case suggest that Signal 88 has some likelihood of success on the merits, the evidence presented does very little to demonstrate that likelihood to the Court. The Court recognizes that a party seeking injunctive relief need not necessarily show a greater than 50 percent likelihood that it will prevail on the merits. *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008). Signal 88 need only show a "fair chance of prevailing" on its claims. *See Powell v. Noble*, 798 F.3d 690, 698 (8th Cir. 2015). But here, Signal 88's chance of succeeding depends on assessing the merits of factual questions on which very little relevant evidence has been adduced. The Court, therefore, finds it difficult to conclude that Signal 88 has met its burden of showing a reasonable probability of success. *See id*.

---

[3] CSC also contends that Signal 88 breached the contract first, and that Signal 88's prior material breach excused CSC's performance under the noncompete provision. As a general matter, that might be the case. *See Smith Baking Co. v. Behrens*, 251 N.W. 826, 827-28 (Neb. 1933); *see generally* T.C. Williams, Annotation, *Restrictive Clause in Employment or Sales Contract to Prevent Future Competition or Performance of Services for Others as Affected by Breach of Party Seeking to Enforce It, of His Own Obligations under the Contract*, 155 A.L.R. 652 (1945 & Supp. 2011). But, as Signal 88 points out, the noncompete provision also contains a no-defense clause, providing that the "existence of any claim or cause of action" of CSC against Signal 88 "will not constitute a defense to the enforcement" of the noncompete provision. Filing 14-2 at 25. And while authority on such no-defense clauses is relatively meager, what authority there is supports their validity. *See Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 732 (Ind. 2008); *see also*, *First Ascent Ventures, Inc. v. DLC Dermacare, LLC*, No. CV-06-1794, 2006 WL 7285609, at *5 (D. Ariz. Oct. 25, 2006); *Barnes Grp., Inc. v. O'Brien*, 591 F. Supp. 454, 462-63 (N.D. Ind. 1984) (applying Ohio law); *Orkin Exterminating Co. v. Harris*, 164 S.E.2d 727, 728-29 (Ga. 1968) (citing *Orkin Exterminating Co. v. Gill*, 152 S.E.2d 411, 413-14 (Ga. 1966)).

PUBLIC INTEREST

Signal 88 argues that the public interest is served by supporting contractual enforcement. Filing 13 at 9. But, of course, that argument depends on the assumption that Signal 88 is in the right on the parties' contract claims, which is yet to be determined. And, the Court notes, there is also a strong public interest in encouraging, rather than stifling, competition in the marketplace. *See Calvin Klein Cosmetics Corp. v. Lenox Labs.*, Inc., 815 F.2d 500, 505 (8th Cir. 1987). The Court does not find the public interest to weigh in favor of granting or denying injunctive relief.

CONCLUSION

The Court finds that when the *Dataphase* factors are weighed, Signal 88 has not met its burden of establishing the propriety of injunctive relief. In particular, there is little evidence of irreparable harm, nor is there evidence that would allow the Court to meaningfully assess Signal 88's probability of succeeding on the merits. Accordingly,

IT IS ORDERED that Signal 88's motion for preliminary injunction (filing 12) is denied.

Dated this 17th day of March, 2017.

BY THE COURT:

*John M. Gerrard*
John M. Gerrard
United States District Judge